**B. DUNCAN et al., Appellants,**

v.

**James Troy WOOLF, Appellee.**

No. 16552.

Court of Civil Appeals of Texas.

Fort Worth.

June 26, 1964.

Rehearing Denied July 17, 1964.

Spence, Martin & Richie, and Gene Richie, Wichita Falls, for appellants.

Prothro & Sellers and Lee Sellers, Wichita Falls, for appellee.

MASSEY, Chief Justice.

This is an appeal by defendants B. Duncan, his wife, and his son J. C. Duncan from a judgment entered in behalf of plaintiff James Troy Woolf. The judgment decreed transfer to him of title to two parcels of rural real estate which B. Duncan and wife had contracted in writing to convey to him by a lease contract containing an option to purchase, dated June 15, 1961.

Judgment is affirmed.

Plaintiff's right to recover in this case lies in *his* right to impress a constructive trust as to one parcel of realty, a 135 acre tract hereinafter termed the Donald property, and, as applied to a separate 280 acre tract, hereinafter termed the Wright property, lies in whether B. Duncan and his wife made out a prima facie case establishing that any of it was part of their "homestead" on June 15, 1961, and, if it had then been a part of their homestead, that it had not thereafter ceased to be such.

We have concluded that plaintiff established his right to have a constructive trust impressed upon the Donald property under answers returned by the jury which settled the question factually. We are furthermore of the opinion that B. Duncan and his wife failed, as a matter of law, to prove

that the Wright property or any part thereof was their homestead on the material date, or,—if we be mistaken in respect thereto,—we are of the opinion that between such time and the time of the trial it was conclusively established that there had been an abandonment of such property as the homestead. As applied to the Wright property the jury found in answer to special issues that B. Duncan and his wife used and occupied some portion of the Wright property as a homestead on and immediately prior to June 15, 1961 and that they did not abandon such as a homestead at any time after that date. These findings were disregarded by the trial court upon motion of the plaintiff.

On or prior to May 2, 1963 plaintiff decided to exercise his option to purchase. It was then discovered that B. Duncan and his wife intended to refuse to convey the properties. It furthermore seems to have become apparent at about the same time that J. C. Duncan, with concurrence of his parents, B. Duncan and wife, had caused the record title to the Donald property to be conveyed to him. This record title stood in the name of third persons and not in B. Duncan and/or his wife. Record title to the Wright property stood in B. Duncan and his wife on June 15, 1961, and at all times since that date. Formal notice by plaintiff to B. Duncan and his wife of plaintiff's election to exercise his option to purchase was served on May 2, 1963. The suit followed.

While not essential to be noticed in connection with resolving the legal questions, it is interesting to note that a portion of the mineral interest under the Wright property was contemplated to be conveyed under the lease and option contract. Before plaintiff made his election to purchase, an oil well had been brought in on the property.

## THE DONALD PROPERTY

On and prior to June 15, 1961 B. Duncan and his wife lived in a house on the Donald property. The origin of their residence and use thereof lay in a lease arrangement made some time in the 1930's with Paul Donald, owner of the property. Some 12 or 13 years prior to date of the trial Paul Donald and B. Duncan had entered into an agreement of sale and purchase of such property for a consideration of $3,600.00. The deed thereto was to be delivered when the property was completely paid for. Thereafter the sum of $250.00 a year was paid to Donald by Duncan, such payments having been agreed upon by B. Duncan and Paul Donald as interest on the unpaid purchase price.

In reliance upon validity of that purchase Duncan thereafter made valuable improvements on the land. His action was with the knowledge and consent of Paul Donald. It is actually uncontradicted that on June 15, 1961, when the lease contract was made, B. Duncan and his wife were residing on the tract as its owners by virtue of this parol sale. Paul Donald was the only party who might assert that there was not a valid conveyance made between the parties under the parol contract. He never made such assertion. He appeared and testified on the trial of the case during the course of which he affirmed the sale and acknowledged that the sum of $250.00 a year thereafter paid to him by the Duncans represented interest on the unpaid purchase price (or unpaid portion of the purchase price).

On or about May 30, 1963 Paul Donald, for and in consideration of the payment of the portion of the purchase price for the Donald property then due to be paid under the contract aforesaid, executed and caused to be executed deeds which conveyed the legal title thereto to J. C. Duncan. Mr. Donald did this at the solicitation of J. C. Duncan, and, under the jury findings returned at the trial of plaintiff's suit, with the knowledge and consent of B. Duncan. The representation made to Paul Donald by J. C. Duncan at the time the former agreed to have the record title thus transferred was that "his father was getting

old, and if it was all right * * * just deed it to him * * *." Paul Donald was aware of the dispute existent at such time between plaintiff and the Duncans. Subject thereof was part of the discussion between him and J. C. Duncan. The latter expressed the opinion that the option portion of plaintiff's contract was not enforceable.

It is positively established in the evidence that on and after June 15, 1961 J. C. Duncan was fully acquainted with the lease contract and all the provisions thereof, particularly the option to purchase section. Prior to the date of any deed to J. C. Duncan plaintiff had already served written notice upon the elder Duncans of his election to exercise the option to purchase.

We believe one proper way to resolve the question of whether J. C. Duncan should be held as a trustee of the Donald property, under the theory of constructive trust, would be to initially treat the antecedent interest in the property as having undoubtedly been vested in the parents of J. C. Duncan. We later discuss the matter of the true interest therein of B. Duncan and his wife, and the determination of whether theirs was the equitable title.

In Restatement of the Law, Trusts, § 288, "Transferee with Notice", it is stated that where the transferee of an interest in trust property has notice that the party making the transfer to him is a trustee who is committing a breach of his trust to a third person in making the transfer, the transferee does not hold the property free of the trust, although he paid value for the transfer.

We proceed, therefore, to the matter of whether B. Duncan and his wife held the equitable title to the property, and as such were entitled to the legal title upon fulfillment of all obligations made a prerequisite to the maturing of their right.

We have no doubt but that B. Duncan and his wife, with respect to their interest in the Donald property, did undertake to stand in the position of trustees for the plaintiff, conditioned and contingent upon the plaintiff exercising his right of purchase granted under the option. That such is correct law does not seem to be a matter at issue between the parties. The issue which is made appears to be predicated upon the altered circumstances existent because (1) the record title to the Donald property, as of June 15, 1961, did not stand in the name of Paul Donald, the only party of whom B. Duncan and his wife might demand legal title, (2) that B. Duncan and his wife never did demand or receive legal title from Paul Donald, and (3) that B. Duncan and his wife were never legally competent to discharge their purported obligation to deliver title to the plaintiff. J. C. Duncan contends that in view of these circumstances he was lawfully entitled to receive, as he did, the complete title from the parties holding the same (albeit with the knowledge and consent of his parents), not only free and clear of any charge laid upon the same by his parents—but free and clear of the claim of any other person by and through them, i. e., by anyone to whom they might have been obliged to deliver the title to the property had that ever come within their power.

The trouble with the contention of J. C. Duncan is that it is clear from the record that his parents had the beneficial ownership of the record at all material times. They had the undoubted right to receive the deed instrument evidencing a complete title upon a delivery by them of the unpaid balance of the agreed purchase price at the very time he received the deeds. It is true that but for the beneficial interest in the same property existent in the plaintiff (pursuant to the contract of June 15, 1961) and "tacked on" to the elder Duncans' beneficial interest (with full knowledge and consent of J. C. Duncan),

they would have been entitled to yield their rights in the property in favor of their son —through their consent that it be deeded to him. That is what they attempted to do. To permit such to be effective, however, would be to eliminate the beneficial interest in the property belonging to the plaintiff. That was not within their power, absent the consent of plaintiff, so long as his contractual rights persisted.

It must be remembered that J. C. Duncan was at all times fully informed of the rights of the plaintiff, by reason whereof he never became a bona fide purchaser for value. He was guilty of tort, since in committing the act or acts which resulted in the delivery of the record title to him he was aware that he was interfering with the interests of the plaintiff and depriving him of property which he otherwise would have received. B. Duncan, and perhaps his wife, were likewise guilty in collusion with him. A remedy of the plaintiff, as beneficiary, would be to have it judicially declared that J. C. Duncan held title to the property as a constructive trustee for him. This declaration was a part of the judgment.

There are numerous sections to be found in Restatement of the Law, Restitution, in which the law is clarified. Some of these are: § 123, "Bona Fide Transferee Who is Not a Purchaser for Value"; § 126, "Rights of Intended Payee or Grantee. Business Transaction", (comment c.); § 133, "Property Tortiously Acquired From Third Person at Another's Expense"; § 138, "Violation of Fiduciary Duty"; § 168, "Wrong by Transferor to Third Person" (comment on subsection (1) b.). Cases bearing upon applicable law include: Edwards v. Strong, 207 S.W.2d 655 (Fort Worth Civ.App., 1947), and opinion modifying at 147 Tex. 155, 213 S.W.2d 979 (1948); Alexander v. Harris, 254 S.W. 146 (Fort Worth Civ.App., 1923, error refused); Mansfield v. Wardlow, 91 S.W. 859, 863 (CCA, Tex.1906, error refused), citing from Pomeroy Equity Jurisprudence

concerning how one may make himself a *mala fide* purchaser; McGowen v. Montgomery, 248 S.W.2d 789, 791 (Amarillo Civ.App., 1952, no writ); and Hill v. Stampfli, 290 S.W. 522, 524 (Tex.Com.App., 1927, with holdings on question approved by Supreme Court).

## THE WRIGHT PROPERTY

This property abutted the Donald property, and contained 280 acres of land. At all material times, beginning some time prior to date of June 15, 1961, title to this property was vested in B. Duncan and his wife. B. Duncan and wife assert that the eastern 199 acres thereof was their "homestead" under provisions of our state Constitution, on and prior to date of June 15, 1961. They also contend that its homestead character continued at all times subsequent, to and inclusive of the date of the trial. Mrs. Duncan refused to sell (as is the right of any wife under our laws, whether or not any antecedent contract to convey might have been made), and the Duncans undoubtedly would be entitled to defeat the plaintiff's suit for specific performance of the contract to convey real property if they have made out a prima facie case under the aforesaid contentions.

We do not believe that there was sufficient probative evidence that any part of the Wright property (a portion of which being the only part of the whole of their estate claimed as a homestead found by the jury to have constituted such) was the parties' homestead on June 15, 1961. We are not, however, confined to such question.

On and after their contract with the plaintiff on June 15, 1961 B. Duncan and his wife owned more than 200 acres of land immediately south and across the road from the Donald and Wright properties. We will refer thereto as the Hill County School land. It was contemplated at the time of the contract with the plaintiff that they would build themselves a new home on

this land. They were given 60 days from date of the contract to accomplish this before they were obliged to move. Such was part of the provisions of the contract. They did construct their new home and did move onto the Hill County School Land before the expiration of the 60 day period. They resided thereon ever since that time. In order to make up the total of 200 acres which could be claimed as the rural "homestead" they claimed the acre of land on which their house was situated.

At no time prior to June 15, 1961 did either B. Duncan or his wife ever file or make any statutory form of declaration of any property as their homestead. After the suit was filed they formally declared and claimed, for the first time, that 199 acres out of the Wright property and the one acre on the Hill County School land comprised such. Prior thereto, for the calendar year 1960, the records of the tax assessor reflected a claim of such character having been made by one of them as to the Hill County School land for tax purposes. Both Duncans denied having made the claim or declaration.

There was no evidence of any "intent" at any particular time antecedent to June 15, 1961 to make any portion of the Wright property a part of the homestead of B. Duncan and his wife. Neither was there any proof of acts or conduct which evidenced such "intent". Be that as it may, and with assumption made for the purpose of discussion that any part of the Wright property (subject of the jury's finding) was a part of the parties' homestead on June 15, 1961, we are convinced that the evidence was conclusive and established as a matter of law that there was an abandonment thereof when the Duncans leased the land for ten years with an option to purchase the same, constructed a new home on the Hill County School land, and moved thereon.

The real question for determination is whether B. Duncan and his wife raised as a question of fact the matter of whether

any portion of the Wright property was used and/or occupied as their homestead on and immediately prior to June 15, 1961, —and if so, whether they abandoned it as such at any subsequent time. All of this property was included in the lease contract with the plaintiff. If it was not imbued with the "homestead" character at the time it was executed, or, if it had such character at such time but was changed because of a subsequent abandonment, the Duncans' claim of right to avoid the obligation reflected in the option portion of the contract with the plaintiff must fail, and plaintiff would be entitled to specific performance. In so concluding we disregard any possible complication through the question occurring in our mind relative to whether plaintiff's right of recovery by his suit must prevail as to both the Wright and Donald property if at all. In any event our decision on the whole case is that plaintiff is entitled to prevail as to both properties.

The jury did find for B. Duncan and his wife that a portion of the Wright property was their homestead on June 15, 1961, and that it was not thereafter abandoned. Therefore, if there was a jury question plaintiff must lose his case. If not, as the trial court concluded when the jury's answers were disregarded, plaintiff has rightfully prevailed as a matter of law.

When the court prepared the charge plaintiff objected to the submission of the questions aforementioned, on the ground that there was no evidence or in any event insufficient evidence to justify any affirmative answers returned thereto. The motion to disregard the answers as returned was of course upon the contention that they had no support in the evidence. On hearing the motion for judgment the court found that they had no support, hence disregarded them in entering judgment for the plaintiff. We agree with the finding.

The Constitution itself provides in cases of the "homestead", rural or urban, that "the same shall be used for the purposes

of a home, or as a place to exercise the calling or business of the head of a family." Article 16, Sec. 51, Vernon's Ann. St. True it is, under the same Constitutional provision, that there may be a "temporary" renting of homestead property without a change effected in its character when no other homestead has been acquired. With reference thereto it is stated in 28 Tex.Jur.2d 514, Homesteads, § 112, "Rural homestead", as follows: "A temporary renting of a rural homestead will not destroy its homestead character. But if a lease of a rural homestead is not merely a temporary renting, the effect of leasing it is to render the homestead claim unsustainable."

The evidence in the record makes it clear that B. Duncan was seventy-three or seventy-four years of age at the time the property was leased to the plaintiff for a ten year period. Hence he knew that it was unlikely that he would personally be able to actively use the Wright property in his business, that of operating a dairy, at the conclusion of the lease period. Indeed, he sold to plaintiff all of his dairy equipment when he leased the property to him. Under these circumstances we believe that the Wright property under the authorities was not "temporarily" rented. We are of the opinion that the effect of the lease itself, coupled with plaintiff's entry upon the property pursuant to its authority, rendered the homestead claim unsustainable as a matter of law.

Use of the property by Duncan and his wife for any "homestead" purpose was discontinued. Its character was changed in a "permanent" sense from a place for the home of B. Duncan and his wife, or as a place for the exercise of a calling or business by B. Duncan, as head of a family,—to property which served as an independent source of income to him from proceeds to be derived in the form of rent. This constitutes abandonment. To continue the homestead protection to property so used would be a perversion of the

spirit, letter, and purpose of the Constitution. Blackburn v. Knight, 81 Tex. 326, 16 S.W. 1075, 1077 (1891); Alexander v. Lovitt, 95 Tex. 661, 69 S.W. 68 (1902); Warren v. Kohr, 26 Tex.Civ.App. 331, 64 S.W. 62 (1901, error refused); Wurzbach v. Menger, 27 Tex.Civ.App. 290, 65 S.W. 679 (1901, no writ).

Judgment is affirmed.